**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **Case No.  23-cr- 272 (TJK)** |
|  | ) |  |
| **v.** | ) |  |
|  | ) |  |
| **STEVE HANNA** | ) |  |
|  | ) |  |
|  | ) |  |

## MEMORANDUM IN AID OF SENTENCING

Steve Hanna grew up most of his life in central Ohio in a hard-working family.  His father worked as a laborer and his mother played bells in the church. He and his twin brother were the youngest of their six children.  Growing up he was eager to earn his GED so he could start working.  When he turned 18 years old, he moved to Florida and started working in construction.  He has been in that field ever since.   Twenty-one years later, Mr. Hanna is still an industrious man, who not only works long hours as a maintenance contractor, but he is also a father of three children, two of whom live with him, and he is a caretaker for his elderly father.

On the morning of January 6th, Mr. Hanna and his brother traveled to Washington, D.C..  And like hundreds of others, Mr. Hanna arrived at the Capitol building.  He walked inside the building like many other people.  He was stopped by police officers and eventually exited the building.  He spent 14 minutes inside. After the incident, he did not post messages on social media about the event.  He had no plan, intention, or thought to take over the government on January 6th.  He was not part of a militia group seeking to overthrow the government.  For these

1

reasons, no further incarceration should be imposed.  Based on the nature and circumstances of the offense, his background, acceptance of responsibility, and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a), the defense respectfully requests a sentence of probation, which would be a sentence not greater than necessary to address his conduct in this case.

## <u>TIMELINE OF JANUARY 6th EVENTS</u>

The timeline of January 6th is well-known.  Approximately 30,000 people were expected to attend.[1]  Around 6 a.m that day, numerous Trump supporters headed towards the rally at the Ellipse and "[m]any began gathering the night before."[2]  The antagonistic speech spread over the crowd of thousands.  At approximately 11 a.m., prominent Trump supporters encouraged the crowd to march to the Ellipse and fight:

An hour later, former President Trump took the stage and implored attendees to "fight" for him, notably stating:

<u>**12 p.m.**</u>                                    We will not let them silence your voices. . . **we're going to walk down to the Capitol**, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if

---

[1]      Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

[2]      George Petras, Janet Loehrke, Ramon Padilla, Javier Zarracina and Jennifer Borresen, *Timeline: How the storming of the U.S. Capitol unfolded on Jan. 6*, USA Today, Updated Feb. 9, 2021, available at https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022).

|  | the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen.[3] |
|---|---|
| **1:10 p.m.** | And we fight. **We fight like hell. And if you don't fight like hell**, you're not going to have a country anymore. . . So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania Avenue. **And we're going to the Capitol**, and we're going to try and give.[4] |

By this time, his supporters started heading towards the Capitol and started fighting with the police.

| **12:54 p.m.** | Protestors breached the restricted perimeter line at Peace Circle on the West Front of the Captiol. |
|---|---|
| **1:10 p.m.** | Supporters "begin grappling with police on the Capitol steps."[5] |
| **1:30 p.m.** | After Trump's speech, "supporters being marching toward the U.S. Capitol."[6] |
| **2:11 p.m.** | Photographs indicate that supporters moved past the police lines on the west side of the Capitol and others scale the walls.[7] |

---

[3]    *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[4]    *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial; see also Petras, *Timeline*, footnote 2 supra, https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/  (emphasis added).

[5]    Petras, *Timeline*, footnote 2 supra.
[6]    Shelly Tan, Youjin Shin and Danielle Rindler, *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post, https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.
[7]    Petras, *Timeline*, footnote 2 supra.

**2:48 p.m.**                      Mr. Hanna enters the Capitol, through the Parliamentarian door on the west side, more than 30 minutes after the first breach of the Capitol, and after hundreds of people had entered the building.

Mr. Hanna left the building approximately 14 minutes later.

## LEGAL PRINCIPLES

Disorderly Conduct in Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), are a class B misdemeanors or "petty offenses", as defined by 18 U.S.C. § 3559(a)(7), because they carry a maximum incarceration period of six months or less each.  The United States Sentencing Guidelines do not apply to class B misdemeanors.  *See* U.S.S.G. §1B1.9.  In addition, pursuant to 18 U.S.C. § 3583(b)(3), the Court is disallowed from imposing a term of supervised release for a petty offense.

Since the Guidelines do not apply, the Court is directed to look to 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]."  The factors enumerated in 18 U.S.C. § 3553(a)(1) include "the nature and circumstances of the offense and the history and characteristics of the defendant."  Additionally, the Court should determine the "need" for the sentence, by considering if and how a term of incarceration would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense."  *Id.* at (2)(A).  Moreover, the Court should consider how a sentence would "afford adequate deterrence to criminal conduct," "protect the

public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id*. at 2 (B-D).  Further still, the Court must be mindful of "the kinds of sentences available," should consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," and should consider the "need to provide restitution to any victims of the offense." *Id*. at (3), (6), & (7).

## **ARGUMENT**

Mr. Hanna is a hardworking 39-year-old maintenance contractor, who is a father of three.  While the nature and circumstances of the January 6th events were indeed serious, his particular actions that day, paired with his individual history and characteristics do not lend itself to a sentence of incarceration.  Rather, a sentence of probation and restitution would meet the purposes of sentencing, without being overly punitive.  A probationary sentence would provide adequate deterrence to Mr. Hanna, avoid unwarranted sentencing disparities among other January 6th defendants and is warranted in light of his nearly stellar performance on pretrial release for the last 9.5 months.

### **I.    Nature and Circumstances of Mr. Hanna's Offense**

The events of January 6th are seared into the nation's memory.  That day and the days after resulted in lost lives and over 1 million dollars in property damage.  In addition, it caused trauma to politicians and staffers and their family members who were present there and who watched from a far.

Mr. Hanna understands and would never minimize the impact of the event on the nation. However, he was not the cause of January 6th, nor was he in the category of people who caused physical harm to others or damage to the Capitol buildings. While there were acts of violence that took place that day, which Mr. Hanna may have heard or seen, he should not be sentenced for the acts of others. The American system of justice, and specifically 18 U.S.C. § 3553(a), directs this Honorable Court to look at every defendant and every defendant's actions individually. *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

As stated above, Mr. Hanna entered the Capitol building, after hundreds of others entered the building. He did not scream, shout, or chant at or with anyone. He did not record his actions for social media or boast about his conduct. When directed by officers not entered part of the building, he left. He spent 14 minutes inside the Capitol. He has accepted responsibility and is remorseful for his conduct and understands that he should not have entered the Capitol.

## II.   <u>Mr. Hanna's History and Characteristics</u>

Mr. Hanna comes from a loving hardworking family. His father worked as laborer and his mother took care of the children and the family attended church. He played football, baseball, softball and played sports on his school teams and for Beaver Creek. Eager to start working and making money, he moved to Florida after he turned 18 years old, to work on pipelines. His work has taken him across

the U.S.  He worked on pipelines in Pennsylvania, Mississippi, Louisiana, Tennessee, and New York.

Mr. Hanna is a loving father.  He has custody of his 10- and 9-year-old sons. He is currently in a relationship and has a 4-month-old daughter.   His mother died four years ago, and he decided to be his father's caretaker.  He currently lives with his father and two sons and plans to move his girlfriend and daughter into his home, where he will be the primary provider for the entire family.

Due to his acceptance of responsibility, his background, and his performance on pre-trial supervision, a probationary non-incarceration sentence would be not greater than necessary to address his conduct in this case.

### III.   A Probationary Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  Incarceration is not required in order for a sentence to reflect the seriousness of the offense.  "A sentence of probation rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."  *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99).

7

**IV.** **A Probationary Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from the Unlikely Chance of Further Crimes of Mr. Hanna.**

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant." The public has been protected while Mr. Hanna has been on pretrial release. For the last nearly 10 months, Mr. Hanna has complied with supervision requirements. In addition, since January 6th, he has committed no offenses. The public will be protected while Mr. Hanna is being supervised by the Probation Officer, which will further deter any criminal conduct.

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016). With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect. Custodial

8

sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions.").  No incarceration is needed to deter criminal conduct in this case.

## V.   Sentence of Probation Would Not Create An Unwarranted Sentencing Disparity

Sentencing Mr. Hanna to probation would not contribute to an unwarranted sentencing disparity. Over 500 defendants have been sentenced in these cases.[8]  A significant majority of the cases have been resolved as misdemeanor offenses. Defendants in other cases whose conduct was similar to Mr. Hanna's received probationary sentences.  This Court has sentenced the following defendants to probation for walking and out of the Capitol building:

| Case | Plea & Sentence | Conduct |
| --- | --- | --- |
| *U.S. v. Kevin Strong* 21-CR-00114 | 40 U.S.C. § 5104(e)(2)(G) 30 days home detention & 24 months' probation | • Defendant spent **30 minutes** inside the Capitol. ECF No. 47 at 7 |
| *U.S. v. Madison Pettit* 21-CR-00744 | 40 U.S.C. § 5104(e)(2)(G) 45 days home detention & 18 months' probation | • Defendant moved the metal barrier, waved others towards the Capitol, spent **14 minutes** inside. ECF No. 45 at 8-16 |
| *U.S. v. Michael Hardin* 21-CR-00280 | 40 U.S.C. § 5104(e)(2)(G) 30 days home detention & 18 months' probation | • Defendant entered the Capitol building and entered the Senate Gallery and spent **28 minutes** inside the Capitol building. ECF No. 35 at 1-11 |
| *U.S. v. Robert Snow* 22-CR-00030 | 40 U.S.C. § 5104(e)(2)(G) 12 months' probation | • Defendant entered the Capitol two minutes after the breach, waved people inside, spent **43 minutes inside**, and made his way to the 3rd floor of the |

---

[8]     This estimate is based on the government's chart, filed in other cases.

| | | |
|---|---|---|
| | | building where many staff offices were located.  ECF No. 26 at 1-2 |
| *U.S. v. Brian Jones* 22-CR-00205 | 40 U.S.C. § 5104(e)(2)(G) 24 months' probation | • Defendant entered the Capitol eight minutes after the breach and spent **30 minutes inside**.  ECF No. 50 at 1-6 |
| *U.S. v. Walter Messer* 21-CR-00631 | 40 U.S.C. § 5104(e)(2)(G) 24 months' probation | • Defendant spent **15 minutes inside**.  ECF No. 59 at 1-10 |
| *U.S. v. Louis Ciampi* 23-CR-00259 | 40 U.S.C. § 5104(e)(2)(G) 18 months' probation | • Defendant spent **44 minutes inside**.  ECF No. 16 at 6. |
| *U.S. v. Israel Matson* 23-CR-00349 | 40 U.S.C. § 5104(e)(2)(G) 12 months' probation | • Defendant spent **32 minutes inside**.  ECF No. 21 at 5-6 |

Even in cases where the defendant not only walked in and out of the Capitol, but also encouraged others to enter the Capitol, deleted social media posts, and/or yelled at officers, (facts not present in this case), the Court sentenced the defendant to probation.

| | | |
|---|---|---|
| *U.S. v. Michael Carico* 21-CR-00696 | 40 U.S.C. § 5104(e)(2)(G) 60 days home detention & 24 months' probation | • Defendant spent **52 minutes** in the Capitol, entered a few minutes after protestors broke inside; and deleted photos and videos he took on Jan. 6th . ECF No. 33 at 1-2 |
| *U.S. v. Gabriel Burress* 21-CR-00744 | 40 U.S.C. § 5104(e)(2)(G) 45 days home detention & 18 months' probation | • Defendant moved the metal barrier, waved others towards the Capitol, and spent **14 minutes** inside. ECF No. 46 at 8-16 |
| *U.S. v. Jordan Stotts* 21-CR-00272 | 40 U.S.C. § 5104(e)(2)(G) 24 months' probation | • Defendant shouted at police officers, scaled the wall on the Upper West Terrace, posted on social media, and spent **nearly** |

| | | **1 hour inside**.  ECF No. 24 at 1-6 |
| --- | --- | --- |

In cases where defendants received 14 days incarceration, the defendant's conduct was far worse than Mr. Hanna's.  In *United States v. Paul Lovely*, 23-CR-00019, the defendant was associated with a right-wing group and decided to travel to the Capitol with four other individuals.  The group entered the Senate Wing doors three minutes after the doors were breached.  They proceeded through the Crypt and down to the hall of the Office of the Clerk and Office of the Majority Leader and entered Nancy Pelosi's conference room.  The defendant also stood by as one of the members of his group attempted to assault an officer by "ramm[ing] a bicycle rack into an officer."  ECF No. 53 at 1-12.  The defendant pled guilty to 40 U.S.C. §§ 5104 (e)(2)(D) and (e)(2)(G) and was sentenced to 14 days of intermittent confinement and 36 months of probation.

In *United States v. Victor Martinez*, 23-CR-39-TSC, the defendant led a small group of protestors and pushed his way into the Capitol, celebrated entering the building, recorded violent scuffles between police and protestors, and spent 50 minutes inside the Capitol.   During a later FBI interview, the defendant minimized his conduct on January 6th.  ECF No. 21 at 1-21.   The defendant pled guilty to 40 U.S.C. § 5104 (e)(2)(G) and was sentenced to 14 days of intermittent confinement and 36 months of probation.

In *United States v. Dusty Higgins*, 23-CR-59-RDM, the defendant recorded a video of himself entering the building through a broken window and posted

messages on Instagram.  The defendant expressed to another individual that he wanted to open a Proud Boys chapter, and his posts on social medial included Three Percenter logo and images. The defendant pled guilty to 40 U.S.C. § 5104 (e)(2)(G) and was sentenced to 14 days of intermittent confinement and 36 months of probation.

In other cases, where defendants pled to the more serious misdemeanor (18 U.S.C. § 1752), they received probation. *See United States v. Rachel Pert*, Crim. No. 21-cr-00139 (sentenced to 24 months' probation); *United States v. Jeffrey Witcher*, Crim. No. 21-cr-00235 (12 months' probation); *United States v. Nicholes Lentz*, Crim. No. 21-cr-00053 (1 month home detention and 36 months' probation).

The 1752 defendants who received intermittent confinement as a part of probation had more egregious than Mr. Hanna.  In *United States v. Blake Reed*, Crim. No. 21-cr-204-BAH.  Reed discussed joining the Proud Boys.  ECF No. 171, p.2.  He posted a video of the crowd marching toward the Capitol which included the threat "we are coming for you."  *Id.*  He wore protective gear "to ward of[f] officers' attempts to protect the Capitol."  *Id.* at 3.  Mr. Hanna did not.  Reed encouraged his co-defendant to remove evidence.  Mr. Hanna did not.  Reed took steps to conceal electronic evidence on his phone.  Mr. Hanna did not.  Reed appears to have mocked law enforcement after the execution of the search warrant.  Id. at p. 25.  Mr. Hanna did not.  Reed received 42 days of intermittent confinement as part of his probationary sentence.  Mr. Hanna's conduct so far below Reed's conduct.  Hence, he should not receive a sentence of incarceration.

In *United States v. Schornak*, 21-cr-278, the defendant received a sentence of 28 days of intermittent confinement and a term of probation.  In that case, Schornak "traveled to the Visitor's Center and stole an American flag."  *Schornak*, 21-cr-278, Gov't Sent. Memo, ECF 62, p. 11.  Mr. Hanna did not steal anything. Schornak boasted about stealing the flag and causing tyranny inside the Capitol and he was "damn proud of it."  Id. at 16.  Mr. Hanna did not.

Of the factors that the government deems to be critical in these cases, most of them are mitigating factors in Mr. Hanna's case.  First, when he entered the Capitol, he did not break any windows to gain entry.  Second, Mr. Hanna did not encourage violence.  Third, he did not encourage property destruction.  Fourth, there is no evidence of significant reaction to violence or destruction.  Fifth, during or after the riot, he did not destroy evidence.  Sixth, Mr. Hanna was inside the building for a relatively brief amount of time, and he did not enter the Senate or House chambers where members of Congress were gathering to certify the election. Seventh, he did not make any notable posts on social media.  Eighth, he has accepted responsibility and demonstrated remorse.

## Conclusion

Considering the § 3553(a) sentencing factors, a probationary sentence, is a sufficient, but not greater than necessary, sentence to satisfy the purposes of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

13

_____/s/_____
Ubong E. Akpan
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500